IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

WARREN H. NICHOLSON          }
and                          }
ENTROPIQ CORPORATION,        }
                             }
Plaintiffs                   }
                             }          Civil Action No. _____
            v.               }
                             }
STEVEN M. JASMIN,            }
JOE FAXLANGER,               }
MANFRED STERNBERG            }
and                          }
GIS QSP SW, INC.             }

**VERIFIED COMPLAINT AND MOTION FOR TEMPORARY RESTRAINING ORDER
AND INJUNCTIVE RELIEF
(EXPEDITED CONSIDERATION REQUESTED)**

### Jurisdiction and Venue

1.  Plaintiff, Warren H. Nicholson ("Nicholson"), is an individual resident citizen of Mobile County, Alabama.

2.  Plaintiff, EntropiQ Corporation ("EntropiQ), is a corporation organized under the laws of the State of Delaware with its principal place of business located in Mobile, Alabama. Nicholson is the majority stockholder of EntropiQ.

3.  Defendant, Steven M. Jasmin ("Jasmin"), on information and belief, is an individual resident citizen of the state of Georgia.

4.  Defendant, Joe Faxlanger ("Faxlanger"), on information and belief, is an individual resident citizen of the state of Virginia.

5.  Defendant, Manfred Sternberg ("Sternberg"), on information and belief, is an individual resident citizen of the state of Texas.

6.  Defendant, GIS QSP SW, Inc. ("GIS QSP SW"), on information and belief, is a corporation organized under the laws of a state other than Alabama with its principal place of business located in Riyadh, Saudi Arabia. GIS QSP SW is controlled by defendant Jasmin.

## Count One
## Request for Temporary Restraining Order and Injunctive Relief

The essence of the need for the temporary restraining order sought by Plaintiffs under Rule 65(b) of the Federal Rules of Civil Procedure and the injunctive relief sought by Plaintiffs under Rule 65(a) of the Federal Rules of Civil Procedure is that the critical and highly valuable intellectual property of EntropiQ is in grave danger of being stolen, if it has not already been stolen, by defendants Jasmin, Faxlanger and GIS QSP SW such that Plaintiffs seek immediate injunctive relief requiring that defendants not use, sell or otherwise dispose of intellectual property to which EntropiQ claims ownership the loss of which would cause irreparable harm to EntropiQ. Additionally, funds in an amount exceeding $800,000 belonging to EntropiQ, and which were supplied to EntropiQ by Nicholson and by Innovate Alabama, a federally funded investment source for small Alabama businesses, was swept out of EntropiQ's operating bank account within the last 24 hours by defendants and transferred to the trust account of defendant Sternberg who is an attorney in the state of Texas and the return of this funding is critical to EntropiQ's ability to continue paying the programming and software development vendors who are working to make EntropiQ's product concept marketable and saleable given that EntropiQ has no other source of funds for making such payments. In further support of this summary of the basis for the temporary restraining order and preliminary injunction they seek, Plaintiffs show the Court as follows:

7.  EntropiQ was founded in 2024 to develop and deliver next generation digital data integrity and security through Post-Quantum Cryptography (PQC).

8.  In 2024, defendant Steven Jasmin and other representatives of EntropiQ approached Nicholson about providing funding for use as working capital for EntropiQ and thereafter Nicholson agreed to provide a loan to EntropiQ in the amount $2.5 million as evidenced by the promissory note attached hereto as Exhibit A.

9.  In further consideration of the $2.5 million loan Nicholson made to EntropiQ in December 2024, Nicholson and EntropiQ executed an Option for Conversion to Equity Side Agreement ("Side Letter Agreement") (attached hereto as Exhibit B) pursuant to which

2

Nicholson was given the option of converting his loan to EntropiQ into equity ownership in the company.

10. In connection with soliciting Nicholson to provide working capital for EntropiQ in 2024, Jasmin and other representatives of EntropiQ told Nicholson that it was expected that EntropiQ's product, referred to as Secure Quantum Entropy as a Service ("QEaaS"), would be fully developed and saleable by April 2025.

11. In June 2025, EntropiQ's QEaaS product was still not sufficiently refined and developed so as to be marketable, and EntropiQ needed additional cash to continue funding development of its product and also to fund its operations. In response to this need, Nicholson agreed to provide an additional $1.5 million to EntropiQ in exchange for which he received 7500 shares of EntropiQ stock. As of that time, the only other equity position in EntropiQ was 10,000 shares of EntropiQ stock owned by GIS QSP SW.

12. In June 2025, EntropiQ was also soliciting an investment in the company by Innovate Alabama. Innovate Alabama is Alabama's first statewide public-private partnership focused on entrepreneurship, technology and innovation which has the goal of empowering entrepreneurs, business owners and students to build a business, a career and a life in Alabama by providing funding to individuals who are seeking to start or build a business in Alabama. The funding for Innovate Alabama is made available by the U.S. Department of the Treasury State Small Business Credit Initiative (SSBCI) through the American Rescue Plan Act of 2021, which directed funds to states to broaden access to capital and resources for small businesses.

13. In August 2025, Innovate Alabama agreed to invest $1 million in EntropiQ in consideration for which Innovate Alabama received 3,030 shares of EntropiQ stock.

14. Aside from Nicholson and Innovate Alabama, no other individual or entity has provided any funding to EntropiQ at any time or in any form.

15. The funding Nicholson provided to EntropiQ, beginning with the $2.5 million loan Nicholson made to EntropiQ in December 2024, was used by the company to pay the software and programming vendors who were working to develop EntropiQ's product concept into a marketable and saleable product.  In addition, Nicholson's funding was used to pay salaries to defendants Jasmin, Faxlanger and Lewis and to pay expenses associated with their world-wide travel ostensibly to promote and market the QEaaS product that EntropiQ would offer.

16. As a condition of providing the $2.5 million loan Nicholson made to EntropiQ in 2024, Nicholson was entitled to receive a security agreement from EntropiQ by which his loan to the company was secured by "nine (9) GIS QSP SW x5000 servers ("Qlab servers"), all other equipment and fixtures owned by the Company and by all intellectual property belonging to the Company as well as all source code, all licenses, all sales contracts, all business records, all communication records and all derivative works presently belonging to the Company as well as all such assets acquired by the Company in the future."  (See Exhibit A at paragraph 3)  When Nicholson delivered the funding for his $2.5 million loan to EntropiQ, he requested that EntropiQ deliver the security agreement to which he was entitled and he continued to request the security agreement to which he was entitled thereafter from EntropiQ without result.  Ultimately, Nicholson had his own attorney prepare the security agreement he was owed by EntropiQ and deliver that security agreement to EntropiQ for execution.  However, and despite repeated follow-ups, Jasmin failed to sign and return the security agreement Nicholson was due from EntropiQ.

17. Ultimately, in September 2025, Nicholson was told by EntropiQ's attorney that Jasmin did not want to sign the security agreement Nicholson proposed because Jasmin did not want the intellectual property developed for EntropiQ through the funding provided by Nicholson to be identified as belonging to EntropiQ. Rather, Jasmin wanted the intellectual property, source code, etc. produced by engineers, vendors, and others who were *all* paid with funds from Nicholson's loan to EntropiQ and with funds from Nicholson's additional $1.5 million June 2025 equity investment in EntropiQ to be owned by GIS QSP SW with such intellectual property, source code, etc. provided to EntropiQ only by means of a license GIS QSP SW would grant EntropiQ.

18. Subsequent to the funding of Nicholson's $2.5 million loan to EntropiQ in December 2024, Nicholson intermittently received financial "reports" from EntropiQ including reports purported as being current balance sheets for EntropiQ which financial reports were extremely sparse and general in the information they provided. In approximately July 2025, Nicholson demanded financial statements from EntropiQ which provided details regarding the intellectual property, licenses, sales contracts and the like which were the assets EntropiQ was obtaining through the millions of dollars EntropiQ had spent in payment for development of the product it ultimately planned to sell. After making this demand, no further financial reports were provided to Nicholson by EntropiQ.

19. Based upon receiving the information that Jasmin intended that GIS would own the intellectual property, source code and the like which had been developed by individuals who were paid with the proceeds of the loan and equity investment Nicholson had provided to EntropiQ and that EntropiQ's access to such intellectual property, source code and the like would only be through a license granted it by GIS and based also on the lack of meaningful financial information and other information he was given by Jasmin and by other members of EntropiQ's

management, and being concerned that EntropiQ's management's actions were defrauding Innovate Alabama and the potential repercussions of a federal government audit of EntropiQ which was a right associated with the funding EntropiQ received from Innovate Alabama, Nicholson determined that he had no choice other than to take control of EntropiQ.

20. On September 16, 2025, Nicholson delivered his "Exercise Notice" in compliance with the requirements of his Side Letter Agreement with EntropiQ and thereby exercised his right to convert the remaining $2,321.428.57 balance of his December 20, 2024 loan to EntropiQ to 7,034 additional shares of EntropiQ stock. (See "Exhibit A" to attached Exhibit B) According to the paragraph 12 of the Side Letter Agreement between EntropiQ and Nicholson, Nicholson's conversion of the loan he was owed by EntropiQ to the EntropiQ stock to which Nicholson was entitled as consideration for his forgiveness of that loan was "deemed to be made as of the close of business on the date the executed Exercise Notice is delivered . . . (the "Conversion Time") [and] Lender [i.e. Nicholson] shall be treated for all purposes as the record holder of such Conversion Shares as of the Conversion Time." (See Exhibit B at paragraph 12)

21. With the 7,034 shares of EntropiQ stock Nicholson obtained on September 16, 2025 in combination with the 7,500 shares of EntropiQ stock Nicholson acquired in consideration for the $1.5 million of funding he provided to EntropiQ in June 2025, Nicholson owned 14,523 of the total of 27,534 shares of EntropiQ stock which are presently outstanding giving him a 52.7% ownership stake in the company.

22. As the now majority stockholder of EntropiQ, Nicholson, as authorized by the by-laws of EntropiQ, hand delivered notice to EntropiQ's registered office in the State of Delaware on September 18, 2025, in accordance with the requirements of EntropiQ's by-laws, that Jasmin and

Faxlanger were removed from the EntropiQ Board of Directors leaving Nicholson as the sole remaining director of EntropiQ.

23. By Board of Directors resolutions adopted by Nicholson thereafter in accordance with the requirements of the by-laws of EntropiQ, Nicholson terminated the employment of Jasmin and Faxlanger and appointed himself the president, secretary, treasurer and CEO of EntropiQ.

24. By an additional Board of Directors resolution adopted by Nicholson on September 18, 2025, the signatory rights of Jasmin and Faxlanger for the EntropiQ bank account at Regions Bank were terminated and Nicholson was appointed as the sole representative of EntropiQ with authority to conduct any banking activities on behalf of the company.

25. Nicholson delivered the EntropiQ Board of Directors resolution which terminated the signatory rights of Jasmin and Faxlanger for the EntropiQ account at Regions Bank and which appointed Nicholson as the sole representative of EntropiQ having signatory rights for that account to Regions Bank on September 18, 2025 at which point in time Regions Bank advised that it was "freezing" the EntropiQ account until such time as it and its attorneys had an opportunity to review the documentation delivered to Regions Bank for supporting Nicholson's authority to change the signatory rights for EntropiQ's Regions Bank account.

26. Despite Regions Bank's representation that the EntropiQ account at the bank was temporarily frozen as of the afternoon of September 18, 2025, defendants were able to sweep the entire $823,000+ balance of EntropiQ's Regions Bank account into the account of Jasmin's attorney, Manfred Sternberg, on the morning of September 19, 2025.

27. The $823,000+ balance which defendants removed from EntropiQ's Regions Bank account on September 19, 2025 was all of the cash owned by EntropiQ at that time and was made up entirely of the remainder of the $1,000,000 investment that Innovate Alabama made in

EntropiQ in August 2025. As of September 19, 2025, EntropiQ's management had expended the entirety of the $2.5 million of funding Nicholson provided to the company in December 2024 as well as the entirety of the additional $1.5 million that Nicholson invested in EntropiQ in June 2025 still without producing a saleable product.

28. A temporary restraining order and preliminary injunction against all defendants is appropriate in that:

    a.  Plaintiffs are likely to succeed on the merits of their claim that EntropiQ is the rightful owner of intellectual property, source code and the like produced and/or developed by individuals whose work was exclusively funded and paid for by EntropiQ and that EntropiQ is the rightful owner of the $823,000+ in cash which defendants withdrew from EntropiQ's Regions Bank account on September 19, 2025;

    b.  Unless defendants are enjoined, there is a substantial likelihood that EntropiQ's irreplaceable intellectual property will be lost or otherwise compromised which will cause irreparable harm to EntropiQ and Nicholson as EntropiQ's majority shareholder and there is a substantial likelihood that the ongoing development of EntropiQ's product will be delayed and disrupted which will irreparably injure EntropiQ's reputation in the market it operates causing it to lose an immeasurable amount of future business as well as an immeasurable amount of customer and potential customer goodwill;

    c.  Greater injury will be inflicted upon the plaintiffs if defendants are not enjoined than will be inflicted upon defendants if defendants are enjoined; and

    d.  Injunctive relief entered against defendants is in the public interest inasmuch as such injunction will protect valuable intellectual property and other intangible rights rightly

owned by one party from being wrongly usurped by another party to whom such property and rights do not belong.

WHEREFORE, Nicholson, as the majority stockholder of EntropiQ, for himself, and also by and on behalf of EntopiQ request that the Court enter a temporary restraining order and, following a hearing, a preliminary injunction which:

A. Directs that Defendants shall not sell, share, license, alter, harm or otherwise dispose of, share, damage or change any intellectual property, source code, proprietary algorithms, proprietary logic, license or sales contract in their possession or under their control which was created, produced or resulted, in whole or in part, from funds or funding originating from EntropiQ;

B. Directs that Defendants immediately provide Plaintiffs with a list of all intellectual property, source code, proprietary algorithms, proprietary logic, license or sales contract in their possession or under their control which relates to the development of Secure Quantum Entropy as a Service;

C. Directs that Defendants immediately cease and desist from engaging in any communication of any nature with third party vendors who were assisting in the development of the Secure Quantum Entropy as a Service or any other product or service for which EntropiQ was a planned seller, distributor, licensor or vendor;

D. Directs and Jasmin and Faxlanger immediately cease and desist from holding themselves out as directors or officers of EntropiQ and discontinue any and all future interference or involvement with the operations or management of EntropiQ; and

E.  Directs that Defendants, including Sternberg specifically who is presently in possession of such funds, immediately return the EntropiQ funds taken from EntropiQ's Regions Bank account to the Regions Bank account from which those funds were taken.

## Count Two
## Breach of Fiduciary Duty

29. Plaintiffs adopt and incorporate, as if fully set forth herein, their allegations set out in paragraphs 1-27 above.

30. Defendant, Jasmin, was, at all times material to the matters described herein, President, Secretary, Treasurer and Executive Chairman of EntropiQ and was, or should have been, actively involved in the company.

31. Defendant, Faxlanger, was, at all times material to the matters described herein, Deputy Chairman of EntropiQ and actively involved in the management of the company.

32. Jasmin, Faxlanger and Nicholson were, at all times material to the matters described herein, the members of the Board of Directors of EntropiQ.  Nicholson did not have a position with EntropiQ other than serving as a member of the Board of Directors.

33. As executive employees of EntropiQ, Jasmin and Faxlanger had a fiduciary duty to EntropiQ and to EntropiQ's shareholders to protect and safeguard the assets of EntropiQ including intellectual property, source code, proprietary algorithms, proprietary logic and the like which was produced and/or created by individuals and entities who and which were paid for their work with funds belonging to EntropiQ.

34. More than $4 million of funding supplied to EntropiQ by Nicholson and by Innovate Alabama has been spent by EntropiQ between December 20, 2024 and the present mainly for continuing to refine and develop the Secure Quantum Entropy as a Service product that EntropiQ was formed to develop and then to market and sell.

10

35. Secure Quantum Entropy as a Service is an intellectual property asset as are the source code, proprietary algorithms and proprietary logic which make QEaaS operable. Given the anticipated value and expected revenue which will be generated by the licensing of QEaaS to end-users of the service, the source code, proprietary algorithms and proprietary logic which make QEaaS operable are extremely valuable assets and assets which must be very closely guarded given that the safeguarding of such assets is essential for protection against other potentially competitive services including services that could be created by the pirating of source code, proprietary algorithms and proprietary logic owned by EntropiQ. The expense of developing this intellectual property has been substantial as evidenced by the amount of money that has been spent to create, refine and complete the development of the QEaaS product that EntropiQ will offer.

36. Despite the fact that it has been entirely EntropiQ money that has been spent to create, refine and complete the development of the QEaaS product EntropiQ will offer, Jasmin and Faxlanger have taken the position that the QEaaS product and its source code, proprietary algorithms and proprietary logic developed through the expenditure of EntropiQ funds are assets owned by GIS QSP SW and that EntropiQ will have the ability to market and sell the QEaaS product developed with its funding only by means of a license EntropiQ will be granted by GIS QSP SW.

37. Jasmin and Faxlanger both work for GIS QSP SW and Jasmin has a significant if not exclusive ownership interest in GIS QSP SW.

38. Jasmin's and Faxlanger's failure to protect EntropiQ's rightful ownership of the QEaaS product developed with EntropiQ funding and the source code, proprietary algorithms and proprietary logic associated with the QEaaS product whose development was paid for by

EntropiQ is a breach of their fiduciary duty to Nicholson as a shareholder of EntropiQ. Jasmin and Faxlanger's attempted facilitation of the ownership of the QEaaS product and all of the intellectual property associated product by GIS QSP SW, with the attendant direct personal financial benefit they will attain from GIS QSP SW's ownership at the expense of the shareholders of EntropiQ, is a further breach of Jasmin's and Faxlanger's fiduciary duty to EntropiQ and its shareholders.

39. Jasmin and Faxlanger have further breached their fiduciary duties to EntropiQ and its shareholders by failing to institute or require the institution of processes and procedures at EntropiQ for ensuring that expenditures of EntropiQ funds was for appropriate purposes and for purposes beneficial to the company, by expending EntropiQ funds for personal benefit such as personal travel which had no potential benefit for EntropiQ, by failing to require contracts and contractual terms which protected EntropiQ's intellectual property and which ensured that intellectual property produced or created by individuals or entities paid by EntropiQ for their work became intellectual property owned by EntropiQ, by the expenditure of EntropiQ funds to pay individuals whose work benefitted an entity other than EntropiQ, and by their neglect of other necessary and appropriate management obligations.

40. Jasmin and Faxlanger also breached their fiduciary duties to EntropiQ by failing to call and hold needed Board of Directors meetings and by intentionally failing to keep Nicholson informed regarding the status of EntropiQ's finances and product development so that Nicholson could properly perform his duties as a member of EntropiQ's Board of Directors.

41. As a result of Jasmin's and Faxlanger's continuing breach of their fiduciary duties to EntropiQ, Nicholson was forced to forgive his loan to EntropiQ in order to secure a majority shareholder position by which he would be better able to force and/or institute the performance

of management actions for EntropiQ that were necessary and critical but which were being neglected and ignored by Jasmin and Faxlanger. Converting his loan to EntropiQ into EntropiQ equity significantly increased Nicholson's risk associated with EntropiQ.

42. Jasmin's and Faxlanger's removal of more than $823,000 from EntropiQ's operating account on September 19, 2025 is an additional breach of their fiduciary duty to EntropiQ and to EntropiQ's shareholders including Nicholson.

WHEREFORE, Plaintiffs requests that the Court adjudicate their breach of fiduciary claim, find that Jasmin and Faxlanger have breached their fiduciary duties to EntropiQ and to the shareholders of EntropiQ, including Nicholson, and award Plaintiffs damages in an amount sufficient to compensate them for damages caused by Jasmin's and Faxlanger's breaches of their fiduciary duties to EntropiQ and its shareholders including by rendering an award of the attorneys' fees and costs expended by Nicholson to bring this lawsuit against them.

## Count 3
## Request for an Equitable Accounting

43. Faxlanger and Jasmin failed to require the preparation and maintenance of appropriate financial records for EntropiQ or, alternatively, intentionally prevented the preparation and maintenance of appropriate financial records for EntropiQ so that the details of their expenditures of EntropiQ funds could not be readily discerned.

44. On information and belief, Jasmin and/or Faxlanger paid costs and expense which were properly attributable to and the rightful responsibility of GIS QSP SW with EntropiQ funds including using EntropiQ funds for the payment of salaries and compensation to individuals whose work benefitted GIS QSP SW and not EntropiQ.

45. On information and belief, Jasmin and/or Faxlanger entered into contracts and/or agreements in the name of and for the benefit of GIS QSP SW while using EntropiQ funds to pay

the financial obligations of GIS QSP SW under those contracts including entering contracts in the name of GIS QSP SW so that intellectual property created pursuant to those contacts would appear to belong to GIS QSP SW while using EntropiQ funds to pay for the work and services performed.

46. The limited financial reports and records provided to Nicholson relating to EntropiQ between December of 2024 and the present are far too vague and unclear to make it possible to determine the details of how EntropiQ's money was spent during that period. Nicholson repeatedly requested more detailed and clear financial reports for EntropiQ during this period, but such requests went unanswered. After June of 2025, EntropiQ's management discontinued providing Nicholson with any financial reports relating to EntropiQ at all.

47. On information and belief, a substantial amount of documentation and details needed for determining how EntropiQ's money has been spent is in the possession of and under the control of GIS QSP SW.

WHEREFORE, Plaintiffs ask that the Court order Jasmin, Faxlanger and GIS QSP SW to provide an accounting that definitively demonstrates and establishes how all EntropiQ funds were expended between December 1, 2024 and the present, that provides a listing of all Quantum Entropy as a Service related intellectual property which GIS QSP SW contends is its property or its asset, that lists all contracts entered into in the name of either EntropiQ or GIS QSP SW relating to the development of QEaaS, and that lists all contracts and licenses entered to date for the use of the QEaaS being developed for either EntropiQ or GIS QSP SW.

Sworn and attested to by:

Warren H. Nicholson

Douglas L. McCoy
Attorney for Plantiffs
HAND ARENDALL HARRISON SALE LLC
104 Saint Francis Street, Suite 300
Mobile, Alabama 36602
251-694-6255
dmccoy@handfirm.com

Defendants May Be Served as Follows:

Steven M. Jasmin
(to be provided)

Joe Faxlanger
3071 Bonnie Brae Ln
Amissville, VA 20106

Manfred Sternberg
1700 Post Oak Blvd.
2 BLVD Place Suite 610
Houston, TX 77056

GIS QSP SW
(to be provided)

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

*Exhibit A*

# ENTROPIQ CORPORATION
## PROMISSORY NOTE

Issuance Date: December 20, 2024       Original Principal Amount: U.S. $2,500,000.00

FOR VALUE RECEIVED, EntropiQ Corporation, a Delaware corporation (the "**Company**"), promises to pay to the order of Warren H. Nicholson (the "**Holder**"), the principal amount of $2,500,000.00 (the "**Principal Amount**"), upon the terms and subject to the conditions set forth herein (this "**Note**"). Within a commercially reasonable time following the execution of this Note, Holder shall deliver the Principal Amount via wire transfer to the trust account of Manfred Sternberg for the benefit of EntropiQ Corporation.

1.       **Interest.** Interest shall accrue on the outstanding Principal Amount, from the date hereof until the date this Note is mutually terminated or paid in full, based upon an "Adjusted Term SOFR Rate" meaning a variable rate of interest adjusted monthly and being the sum of the Term Secured Overnight Financing Rate ("**SOFR**") for the "Interest Period" plus a margin of 11.175 percent simple annual interest (the variable Term SOFR plus the fixed margin rate collectively being the "**Interest Rate**"). For the purpose of determining the variable Term SOFR Rate applicable under this Note, the initial Interest Period is a one month period commencing with the date of the Note and subsequent Interest Periods shall commence on the day of the next following month which corresponds numerically with the date of the Note or which is the last business day preceding the date which numerically corresponds with the date of the Note if the corresponding date falls on a Saturday, Sunday or holiday. The Term SOFR applicable shall be the Term SOFR published by the Federal Reserve Bank of New York. All accrued interest is due and payable in full upon maturity, mutual termination, or prepayment of this Note, as provided herein. All cash payments received by the Holder in respect of this Note shall be applied first to accrued interest and thereafter to the repayment of the outstanding Principal Amount.

2.       **Payment.** The Company shall repay the Note over a period of four (4) years (the "**Loan Period**"). The Company shall make estimated interest only payments in the amount of $25,242.00 per month for the first six months following the date of the Note.  After six months, and for the remaining forty-two (42) months of the Loan Period, the Company shall repay the Note by (a) making equal monthly payments of principal in the amount of $59,523.81, and (b) payment of an amount equal to the Interest Rate multiplied by the then-current outstanding loan balance in satisfaction of the monthly accrued interest. The estimated repayment schedule is attached as Exhibit A. Notwithstanding the foregoing, the actual Interest Rate applicable to the monthly payments is subject to adjustment based on the applicable variable interest rates. The Holder shall invoice the Company monthly for the Note payment next due. Holder shall include in the invoice the calculation for the Adjusted Term SOFR Rate. The Company shall make each monthly Note payment due by no later than the tenth (10th) day of each month with payment having been made on the date when payment funds or an appropriate instrument for transferring payment funds are received by Holder.  In the event the Company fails to make any payment on or before the 10th day of any month when payment is due, the Company shall owe a late fee in the amount of 5% of

1

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

the payment not timely made which late fee shall be owed and due to be paid no later than the date when the next monthly payment is due.

3.    **Security.**  The Company's obligations hereunder, for the entirety of the Loan Period, are secured by nine (9) GIS QSP SW x5000 servers ("Qlab servers"), all other equipment and fixtures owned by the Company and by all intellectual property belonging to the Company as well as all source code, all licenses, all sales contracts, all business records, all communication records and all derivative works presently belonging to the Company as well as all such assets acquired by the Company in the future.  The Company agrees that it will, if requested by Holder, execute a separate Security Agreement which can be filed by Holder as evidence of Holder's security interest in the assets described in this paragraph. The Holder agrees that it will, if requested by the Company, execute a separate Equipment Loan Agreement which can be used for commercial purposes of the Company. The Holder shall release his security interest in the above collateral on the earlier of mutual termination, or full repayment of all amounts due under the Note.

4.    **Acquisition**.  Immediately prior to the closing of a merger, share exchange, consolidation, acquisition of all or substantially all of the assets or stock, reorganization or liquidation of the Company that results in the pre-acquisition stockholders of the Company owning less than 50% of the voting capital stock of the Company (or its successor or parent corporation) immediately after the transaction or, in the case of a sale of assets or liquidation, the Company owning after the transaction less than substantially all of the assets owned by the Company prior to the transaction (other than an issuance of equity securities for the primary purpose of raising capital) or any other event that constitutes a "**Deemed Liquidation Event**" as that term is generally understood in business parlance (an "**Acquisition**") that occurs prior to the satisfaction in full by the Company of all outstanding Principal Amount and accrued interest under this Note (including satisfaction by mutual termination), the Holder may accelerate the total Principal Amount balance due to the date of closing of the Acquisition transaction and thereupon the Company shall be obligated to pay Holder an amount equal to the outstanding Principal Amount and all unpaid, accrued interest in full satisfaction of its obligations hereunder.

5.    **Event of Default**. If the Company (a) fails to pay when due any principal or interest payment on the due date and such payment shall not have been made within five (5) days of the Company's receipt of the Holder's written notice to the Company of such failure to pay; (b) materially breaches any other covenant contained in this Note and such failure continues for fifteen (15) days after the Company receives written notice of such material breach from the Holder; (c) voluntarily files for bankruptcy protection or makes a general assignment for the benefit of creditors; or (d) is the subject of an involuntary bankruptcy petition and such petition is not dismissed within 60 days, then in any such case the Holder may, upon written notice to the Company, declare the Note in default and immediately due and payable in full. From that date forward, the remaining unpaid Principal Amount owed under this Note, and all interest accrued but unpaid at such time as well as all unpaid late fees, shall bear interest at a rate of the lower of eighteen percent (18%) per annum or the highest rate allowed by applicable law (the "**Default Rate**"), until paid in full.

6.    **Representations and Warranties by the Company**. The Company hereby represents and warrants to the Holder as follows: (a) the Company is a corporation duly

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

incorporated and in good standing under the laws of the State of Delaware; (b) the Company is not in violation of or in default under its charter documents or in violation or default of any material judgment, order, writ, decree, statute, rule, or regulation that is applicable to the Company or any material mortgage, indenture, agreement, instrument, or contract to which the Company is a party; (c) all corporate action on the part of the Company, its directors and stockholders necessary for the authorization, sale, issuance and delivery of this Note has been taken; (d) this Note, when executed and delivered by the Company, shall constitute a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies; (e) the execution and delivery of this Note does not violate any material judgment, order, decree, statute, rule, or regulation applicable to the Company or violate any individual's mortgage, indenture, agreement, instrument, or contract to which the Company is a party; and (f) the Company has no indebtedness for borrowed money, other than the Note.

7. **Information Rights**. So long as this Note is outstanding, the Company agrees to deliver to Holder any information provided to stockholders of the Company in their capacity as such and/or to any other creditor of the Company and, upon request of Holder, such other information that a stockholder or creditor of the Company would be entitled to receive by law or under the charter documents of the Company.

8. **Notices**. All notices provided for in this Note shall be in writing and deemed to be duly given upon (a) personal delivery, (b) four business days after deposit in the United States mail, certified or registered, postage prepaid and (c) one business day after deposit with a reputable, national overnight courier service for next business day delivery with all charges prepaid. A copy of all notices (which shall not constitute delivery hereunder) shall also be sent by email on the same day notice is first given by one of the methods described in the preceding sentence. Notices shall be sent to the addresses set forth below or at such other address as a party may designate by ten (10) days advance written notice to the other party given in the foregoing manner:

If to Company:    EntropiQ Corporation
131 Continental Drive, Suite 305
Newark, Delaware 19713
Attn: Steve Jasmin, President
sjasmin@gisqsp.com

If to Holder:    Warren H. Nicholson
820 S. University Boulevard, Suite 4E
Mobile, Alabama 36609
warren.nicholson@nfina.com

12. **Governing Law**. This Note, and any disputes arising under this Note, will be governed by and construed in accordance with the laws of the State of Alabama, without giving effect to any conflict of laws principle to the contrary. The Company and the Holder agree that the

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

state and federal courts located in Mobile County, Alabama will have exclusive jurisdiction over any dispute between them arising out of this Note.

13. **Assignment**. The rights and obligations of the Company and the Holder shall be binding upon and shall inure to the benefit of their successors, assigns and transferees. Holder may not assign or otherwise transfer this Note without the prior written consent of the Company.

14. **Waiver and Amendment**. The provisions of this Note may be amended or waived only upon the written consent of the Company and the Holder.

15. **Collection Costs**. The Company agrees to pay all costs and expenses, including without limitation reasonable attorneys' fees, incurred by the Holder in any action brought to enforce the terms of this Note and/or to collect this Note, and in any appeal thereof.

16. **Headings**. Headings used in this Note have been included for convenience and ease of reference only and will not in any manner influence the construction or interpretation of any provision of this Note.

17. **Only Company Liable**. In no event shall any stockholder, officer, director or employee of the Company be liable for any amounts due or payable pursuant to this Note.

18. **Expenses**. Each of the Company and the Holder will bear its own expenses associated with the negotiation and execution of this Note.

19. **Counterparts**. The Note may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Counterparts may be duly delivered and executed by email or electronic signature service.

20. **Cooperation**. Each party shall take all actions as may be reasonably necessary to consummate the transactions contemplated by this Note, including, without limitation, entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

\* \* \*

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

The Company has caused this Promissory Note to be signed by its duly authorized officer and dated the day and year first above written.

**EntropiQ Corporation**

By: _Steven Jasmin_ _____

Name: Steven Jasmin _____

Title: CEO _____

**Holder**

_Warren H. Nicholson_ _____

Warren H. Nicholson

**SIGNATURE PAGE TO PROMISSORY NOTE**

## EXHIBIT A

**Loan Repayment Schedule**

| | | |
|---|---|---|
| Loan Principal | $ | 2,500,000.00 |
| Base Rate Interest | | 11.175% |
| Federal Reserve Bank of New York | | |
| 30-Day Average (12.19.24) | | 4.60460% |

| Month | Interest Payment (EST) | Principal Payment | Outstanding Loan Balance | Option Shares Available by Forgiveness of Loan | Option Shares Available for Purchase in Cash | Price of Remaining Option Shares | Check | Post-SAFE % Ownership |
|---|---|---|---|---|---|---|---|---|
| 1 | 25,242.00 | $ - | $ 2,500,000.00 | 7,576 | 0 | $ - | 7,576 | 30.12% |
| 2 | 25,242.00 | $ - | $ 2,500,000.00 | 7,576 | 0 | $ - | 7,576 | 30.12% |
| 3 | 25,242.00 | $ - | $ 2,500,000.00 | 7,576 | 0 | $ - | 7,576 | 30.12% |
| 4 | 25,242.00 | $ - | $ 2,500,000.00 | 7,576 | 0 | $ - | 7,576 | 30.12% |
| 5 | 25,242.00 | $ - | $ 2,500,000.00 | 7,576 | 0 | $ - | 7,576 | 30.12% |
| 6 | 25,242.00 | $ - | $ 2,500,000.00 | 7,576 | 0 | $ - | 7,576 | 30.12% |
| 7 | 32,091.45 | $ 59,523.81 | $ 2,440,476.19 | 7,395 | 180 | $ 59,523.81 | 7,575 | 30.12% |
| 8 | 31,308.73 | $ 59,523.81 | $ 2,380,952.38 | 7,215 | 361 | $ 119,047.62 | 7,576 | 30.12% |
| 9 | 30,526.01 | $ 59,523.81 | $ 2,321,428.57 | 7,035 | 541 | $ 178,571.43 | 7,576 | 30.12% |
| 10 | 29,743.29 | $ 59,523.81 | $ 2,261,904.76 | 6,854 | 722 | $ 238,095.24 | 7,576 | 30.12% |
| 11 | 28,960.58 | $ 59,523.81 | $ 2,202,380.95 | 6,674 | 902 | $ 297,619.05 | 7,576 | 30.12% |
| 12 | 28,177.86 | $ 59,523.81 | $ 2,142,857.14 | 6,494 | 1,082 | $ 357,142.86 | 7,576 | 30.12% |
| 13 | 27,395.14 | $ 59,523.81 | $ 2,083,333.33 | 6,313 | 1,263 | $ 416,666.67 | 7,576 | 30.12% |
| 14 | 26,612.42 | $ 59,523.81 | $ 2,023,809.52 | 6,133 | 1,443 | $ 476,190.48 | 7,576 | 30.12% |
| 15 | 25,829.70 | $ 59,523.81 | $ 1,964,285.71 | 5,952 | 1,623 | $ 535,714.29 | 7,575 | 30.12% |
| 16 | 25,046.98 | $ 59,523.81 | $ 1,904,761.91 | 5,772 | 1,804 | $ 595,238.10 | 7,576 | 30.12% |
| 17 | 24,264.27 | $ 59,523.81 | $ 1,845,238.10 | 5,592 | 1,984 | $ 654,761.90 | 7,576 | 30.12% |
| 18 | 23,481.55 | $ 59,523.81 | $ 1,785,714.29 | 5,411 | 2,165 | $ 714,285.71 | 7,576 | 30.12% |
| 19 | 22,698.83 | $ 59,523.81 | $ 1,726,190.48 | 5,231 | 2,345 | $ 773,809.52 | 7,576 | 30.12% |
| 20 | 21,916.11 | $ 59,523.81 | $ 1,666,666.67 | 5,051 | 2,525 | $ 833,333.33 | 7,576 | 30.12% |
| 21 | 21,133.39 | $ 59,523.81 | $ 1,607,142.86 | 4,870 | 2,706 | $ 892,857.14 | 7,576 | 30.12% |
| 22 | 20,350.67 | $ 59,523.81 | $ 1,547,619.05 | 4,690 | 2,886 | $ 952,380.95 | 7,576 | 30.12% |
| 23 | 19,567.96 | $ 59,523.81 | $ 1,488,095.24 | 4,509 | 3,066 | $ 1,011,904.76 | 7,575 | 30.12% |
| 24 | 18,785.24 | $ 59,523.81 | $ 1,428,571.43 | 4,329 | 3,247 | $ 1,071,428.57 | 7,576 | 30.12% |
| 25 | 18,002.52 | $ 59,523.81 | $ 1,369,047.62 | 4,149 | 3,427 | $ 1,130,952.38 | 7,576 | 30.12% |
| 26 | 17,219.80 | $ 59,523.81 | $ 1,309,523.81 | 3,968 | 3,608 | $ 1,190,476.19 | 7,576 | 30.12% |
| 27 | 16,437.08 | $ 59,523.81 | $ 1,250,000.00 | 3,788 | 3,788 | $ 1,250,000.00 | 7,576 | 30.12% |
| 28 | 15,654.37 | $ 59,523.81 | $ 1,190,476.19 | 3,608 | 3,968 | $ 1,309,523.81 | 7,576 | 30.12% |
| 29 | 14,871.65 | $ 59,523.81 | $ 1,130,952.38 | 3,427 | 4,149 | $ 1,369,047.62 | 7,576 | 30.12% |
| 30 | 14,088.93 | $ 59,523.81 | $ 1,071,428.57 | 3,247 | 4,329 | $ 1,428,571.43 | 7,576 | 30.12% |
| 31 | 13,306.21 | $ 59,523.81 | $ 1,011,904.76 | 3,066 | 4,509 | $ 1,488,095.24 | 7,575 | 30.12% |
| 32 | 12,523.49 | $ 59,523.81 | $ 952,380.95 | 2,886 | 4,690 | $ 1,547,619.05 | 7,576 | 30.12% |
| 33 | 11,740.77 | $ 59,523.81 | $ 892,857.14 | 2,706 | 4,870 | $ 1,607,142.86 | 7,576 | 30.12% |
| 34 | 10,958.06 | $ 59,523.81 | $ 833,333.33 | 2,525 | 5,051 | $ 1,666,666.67 | 7,576 | 30.12% |
| 35 | 10,175.34 | $ 59,523.81 | $ 773,809.52 | 2,345 | 5,231 | $ 1,726,190.48 | 7,576 | 30.12% |
| 36 | 9,392.62 | $ 59,523.81 | $ 714,285.72 | 2,165 | 5,411 | $ 1,785,714.29 | 7,576 | 30.12% |
| 37 | 8,609.90 | $ 59,523.81 | $ 654,761.91 | 1,984 | 5,592 | $ 1,845,238.09 | 7,576 | 30.12% |
| 38 | 7,827.18 | $ 59,523.81 | $ 595,238.10 | 1,804 | 5,772 | $ 1,904,761.90 | 7,576 | 30.12% |
| 39 | 7,044.46 | $ 59,523.81 | $ 535,714.29 | 1,623 | 5,952 | $ 1,964,285.71 | 7,575 | 30.12% |
| 40 | 6,261.75 | $ 59,523.81 | $ 476,190.48 | 1,443 | 6,133 | $ 2,023,809.52 | 7,576 | 30.12% |
| 41 | 5,479.03 | $ 59,523.81 | $ 416,666.67 | 1,263 | 6,313 | $ 2,083,333.33 | 7,576 | 30.12% |
| 42 | 4,696.31 | $ 59,523.81 | $ 357,142.86 | 1,082 | 6,494 | $ 2,142,857.14 | 7,576 | 30.12% |
| 43 | 3,913.59 | $ 59,523.81 | $ 297,619.05 | 902 | 6,674 | $ 2,202,380.95 | 7,576 | 30.12% |
| 44 | 3,130.87 | $ 59,523.81 | $ 238,095.24 | 722 | 6,854 | $ 2,261,904.76 | 7,576 | 30.12% |
| 45 | 2,348.15 | $ 59,523.81 | $ 178,571.43 | 541 | 7,035 | $ 2,321,428.57 | 7,576 | 30.12% |
| 46 | 1,565.44 | $ 59,523.81 | $ 119,047.62 | 361 | 7,215 | $ 2,380,952.38 | 7,576 | 30.12% |
| 47 | 782.72 | $ 59,523.81 | $ 59,523.81 | 180 | 7,395 | $ 2,440,476.19 | 7,575 | 30.12% |
| 48 | 0.00 | $ 59,523.81 | $ 0.00 | 0 | 7,576 | $ 2,500,000.00 | 7,576 | 30.12% |

NEITHER THIS LETTER NOR THE SECURITIES ISSUABLE UPON CONVERSION HEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAW, AND NO INTEREST HEREIN OR THEREIN MAY BE SOLD, DISTRIBUTED, ASSIGNED, OFFERED, PLEDGED OR OTHERWISE TRANSFERRED UNLESS (A) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS COVERING ANY SUCH TRANSACTION, (B) THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF SUCH SECURITIES (CONCURRED IN BY COUNSEL FOR THE COMPANY) THAT SUCH TRANSACTION IS EXEMPT FROM REGISTRATION, OR (C) THE COMPANY OTHERWISE SATISFIES ITSELF THAT SUCH TRANSACTION IS EXEMPT FROM REGISTRATION.

**ENTROPIQ CORPORATION**
131 Continental Drive, Suite 305
Newark, DE 19713

December 20, 2024

SENT VIA EMAIL

Warren H. Nicholson
820 S. University Blvd., Ste 4E
Mobile, AL 36609

RE: Option for Conversion to Equity Side Agreement ("**letter**")

Dear Warren H. Nicholson:

This letter confirms the agreement between Warren H. Nicholson (the "**Lender**") and EntropiQ Corporation, a Delaware corporation (the "**Company**") that in partial consideration of the Lender's loan of two million five hundred thousand dollars ($2,500,000) according to the Promissory Note issued December 20, 2024 and related agreements executed by the parties (collectively the "**Loan**") the Company hereby grants the Lender the option to convert the outstanding Principal Amount of the Loan to equity in the Company. Unless the context otherwise requires, capitalized terms that are not defined herein will be defined in the Loan and such terms are hereby expressly incorporated into this letter by reference. The parties further agree as follows:

1. <u>SAFE Note Shares.</u> As described in the SAFE Term Sheet and Exhibit A below, EntropiQ shall issue 15,152 new shares ("**SAFE Shares**") at a price of $330.00 per share (the "**Share Price**").

2. <u>Option.</u> Subject to the terms and conditions of this letter, the Lender shall have the right but not the obligation to purchase up to 7,576 SAFE Shares of the Company (the "**Option Shares**") at the Option Exercise Price.

   a. The "**Option Exercise Price**" is $330.00 per share, equal to the quotient of the pre-money valuation ($3,300,000) divided by the outstanding common stock of the Company (10,000).

   b. The Lender shall have the right to purchase Option Shares at the Option Exercise Price by converting the outstanding principal balance of the Loan into Option Shares, as described in Exhibit A. If the Lender exercises his right to convert the Loan to Option Shares, then he may also purchase additional Option Shares at the Option Exercise Price, as described herein and Exhibit A.



Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

    c.   For the avoidance of doubt, the total number of Option Shares available for purchase by Lender is payable by (i) forgiveness of the Loan plus (ii) cash consideration, as described in Exhibit A.

        i.   The number of Option Shares available for purchase by forgiveness of the Loan is equal to the quotient of the outstanding balance of the Loan divided by the Option Exercise Price, as described in Exhibit A.

        ii.   The number of Option Shares available for purchase in cash is equal to 7,576 less the quotient of the outstanding balance of the Loan divided by the Option Exercise Price, as described in Exhibit A.

    d.   The Lender shall duly certify the entire Loan balance is forgiven on purchase of the Option Shares, and the Lender shall pay for the Option Shares (if any purchased by cash) by certified bank check or by wire transfer of immediately available funds at the Closing.

    e.   The post-exercise, fully diluted, ownership of the Lender in the Company for the Option Shares, assuming all of the available Option Shares are purchased, is 30.12% (rounded to the hundredth decimal place (0.01)). The conversion calculations and cap table are attached as Exhibit A to this letter.

3.   <u>Option Period</u>. The Lender shall have the right to exercise the Option ("**Option Period**") until the earlier of: (a) the next qualified financing event of the Company after the current Seed Round wherein the Company completes a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells equity at a fixed valuation; (b) the repayment, forgiveness, conversion, or cancelation of the Loan; (c) the transfer of the Loan without the written consent of the Company; (d) the consummation of a sale of the Company's securities pursuant to a registration statement filed by the Company under the Securities Act to the general public either in connection with a firm commitment underwritten offering of its securities or in a direct listing by the Company of its securities on a national securities exchange; (e) the Company's completion of a merger, consolidation or share exchange with a special purpose acquisition company or its subsidiary in which the Company's securities of the surviving or parent entity are listed on a national securities exchange; and (f) the consummation of a merger or consolidation of the Company that is effected (i) for independent business reasons unrelated to extinguishing such rights; and (ii) for purposes other than (A) the reincorporation of the Company in a different state; or (B) the formation of a holding company that will be owned exclusively by the Company's stockholders and will hold all of the outstanding shares of capital stock of the Company or its successor. For the avoidance of doubt, on the occurrence of any of the foregoing, the Option rights terminate.

4.   <u>Conversion on Acquisition</u>. If an Acquisition occurs prior to the satisfaction in full by the Company of all outstanding Principal Amount and accrued interest under the Loan (including through the conversion of such amounts into common stock of the Company as provided herein), then the Lender may waive his right to accelerate payment of the Principal and instead elect to convert the outstanding Principal Amount into equity pursuant to Section 2. For the avoidance of doubt, on conversion pursuant to this Section, all unpaid and accrued interest is payable to the Lender on the conversion date.

5.   <u>Further Agreements on Acquisition</u>. In conjunction with any Acquisition, the Lender shall execute all documentation required to be executed by other creditors of Company in connection with the Acquisition (the "**Acquisition Agreements**"), including without limitation escrow, indemnification and other similar agreements.

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

6. <u>Procedure</u>.

   a. If the Lender decides to exercise the Option during the Option period, then the Lender shall deliver to the Company a written, unconditional, and irrevocable notice exercising the Option right using the exercise notice template attached as <u>Exhibit B</u> ("**Exercise Notice**").

   b. The Company shall at the Closing represent and warrant (i) the Company has all necessary power and authority and has taken all necessary corporate action to sell the Option Shares, and (ii) the Option Shares are free and clear of any and all mortgages, pledges, security interest, options, rights of first offer, encumbrances, or other restrictions or limitations of any nature other than those arising under the terms of this letter or the stockholders agreement of the Company.

   c. The sale of Option Shares pursuant to Section 2 ("**Closing**"), will take place no later than 30 days following receipt by the Company of the Lender's Exercise Notice. The parties will mutually agree to the method, time, and place of Closing.

7. <u>Prerequisite for Angel Investors</u>. Pursuant to the Memorandum of Understanding Between Warren H. Nicholson and EntropiQ Corporation dated December 20, 2024 ("**MOU**"), the Company must raise at minimum $1,500,000 from angel investors within 120 days of executing the MOU ("**Prerequisite**"). Angel investors means any person or entity investing into the Company as part of the Seed Round.

   a. If the Company has an executed letter of intent, and proof of sufficient funds (POF) from an angel investor(s) on expiration of the 120 day period, then the 120 day period may be extended for an additional 30 days to close the transaction.

   b. The Seed Round will close at the end of the 120 day period, unless extended as described above.

8. <u>Failure to Satisfy the Prerequisite</u>.

   a. If the Company raises at least $250,000, but fails to raise the full Prerequisite, then Lender shall purchase $1,500,000 worth of additional common stock less the amount actually paid by angel investors at a discount price equal to $200 per share (39.3939% discount).

   b. If the Company raises no funds from angel investors in the Seed Round, then Lender shall purchase $1,500,000 worth of additional common stock at a discount price equal to $165 per share (50% discount).

9. <u>Prerequisite Conversion Procedure</u>. The Company shall deliver to the Lender a written, unconditional, and irrevocable Exercise Notice setting forth the terms of Lender's right to acquire additional shares at a discounted price.

   a. The Company shall at the Discount Closing represent and warrant (i) the Company has all necessary power and authority and has taken all necessary corporate action to sell the shares, and (ii) the shares are free and clear of any and all mortgages, pledges, security interest, options, rights of first offer, encumbrances, or other restrictions or limitations of any nature other than those arising under the terms of this letter or the stockholders agreement of the Company.

   b. The sale of shares for a discount pursuant to Section 8 ("Discount Closing") will take place no later than 7 days following receipt by the Lender of the Exercise Notice. The parties will mutually agree to the method, time, and place of Discount Closing. The Lender shall pay for the shares purchased by certified bank check or by wire transfer of immediately available funds at the Discount Closing.

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

10. <u>Termination</u>. This letter and the rights and obligations described herein will terminate and be of no further force or effect at the earlier to occur of Closing, or when the Option rights terminate as set forth in Section 3. The confidentiality obligations of the Lender referenced herein will survive any termination.

11. <u>Additional Conversion Terms.</u> If the Lender exercises the Option, then the Lender shall convert the entire outstanding principal balance of the Loan. If there is any accrued and unpaid interest on the Loan at the time of conversion, then the Company shall pay such accrued interest in cash consideration to the Lender. For avoidance of doubt, any duly completed conversion of the Loan into common stock (or any other capital stock) of the Company constitutes a "mutual termination" for purposes of the Loan.

12. <u>Effect of Conversion</u>. Upon conversion of the Loan into equity in accordance with this letter, and, if and as applicable, upon receipt by the Company of an Exercise Notice, the Company shall promptly issue and deliver to the Lender (a) a certificate or certificates for the shares issuable upon any conversion pursuant to this letter ("**Conversion Shares**") and (b) a capitalization table that reflects the Company's Fully-Diluted Capitalization as of the Conversion Time (as defined below) certified as accurate and complete by a senior officer of the Company. Such conversion shall be deemed to be made as of the close of business on the date the executed Exercise Notice is delivered or, in the case of an Acquisition, immediately prior to the closing of such Acquisition, whichever is earlier (in each case, the "**Conversion Time**"). The Lender shall be treated for all purposes as the record holder of such Conversion Shares as of the Conversion Time. No fractional Conversion Shares shall be issued in connection with any conversion of this Note, and any fractional amount shall be rounded up or down to the nearest whole share in lieu of any such fraction (and any fraction representing one-half of a share shall be rounded up). The issuance of Conversion Shares to the Lender in accordance with the terms of this letter shall constitute satisfaction in full of the obligations of the Company under the Loan.

13. <u>Fully-Diluted Capitalization</u>. "Fully-Diluted Capitalization" means the number of issued and outstanding shares of the Company's common stock, conversion of all SAFEs issued during the Seed Round, capital stock issuable upon conversion of Seed Round SAFEs. Notwithstanding the foregoing, "Fully-Diluted Capitalization" excludes: (i) any convertible promissory notes issued by the Company; (ii) any SAFEs issued by the Company after close of the Seed Round; and (iii) any capital stock that is issuable upon conversion of any outstanding convertible promissory notes or SAFEs issued after close of the Seed Round.

14. <u>GIS QSP SW Purchase Right.</u> If the Lender does not exercise the entire available Option Shares, then GIS QSP SW may acquire the remaining Option Shares pursuant to the terms of Section 2 and the procedure of Section 6. For the avoidance of doubt, the total number of Option Shares that GIS QSP SW can acquire is limited to 7,576 less the quotient of the outstanding balance of the Loan divided by the Option Exercise Price as calculated in the Exercise Notice. Furthermore, GIS QSP SW's right is wholly conditioned on Lender waiving its right to pay the Option Exercise Price and acquire the additional Option Shares pursuant to Section 2.

15. <u>Director.</u> If the Company meets the Prerequisite, and so long as either (a) the Loan is outstanding, (b) the Lender has the Option to acquire at minimum 20% of the fully diluted equity of the Company, or (c) the Lender holds at minimum 20% of the fully diluted equity of the Company; then the Lender may appoint one (1) director to the board of directors of the Company.

16. <u>Failure of Prerequisite Director Appointment Process</u>. If the Company fails to meet the Prerequisite, and the Lender acquires shares pursuant to Section 8, then the board of directors shall be composed of three directors. GIS QSP SW shall appoint two directors, and the Lender shall appoint one director. If the Lender exercises its option pursuant to Section 2, then the Company and its directors shall increase the size of the board to 5 members. GIS QSP SW shall appoint two directors; the

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

Lender shall appoint two directors, and the four so-appointed directors shall appoint a fifth independent director. During the pendency of the election of the fifth director, and for the avoidance of doubt, a quorum for the board may be established by two members, and the President of the Company shall have the deciding vote to resolve any deadlock amongst the directors.

17. <u>Representations and Warranties of the Company</u>. The Company represents and warrants it shall take all corporate action necessary to ensure the Conversion Shares issued according to this letter will, upon issuance, be duly authorized, validly issued and fully paid in accordance with the articles of incorporation of the Company.

18. <u>Representations and Warranties by the Lender</u>. By acceptance of this letter, the Lender represents and warrants to the Company as of the time of issuance of this Note as follows: (a) collectively this letter and any Conversion Shares issued upon the conversion hereof (the "**Securities**") will be acquired for the Lender's own account for investment and not with a view to, or for resale in connection with, any distribution or public offering thereof within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"), or applicable state securities laws; (b) the Lender understands that the Securities have not been registered under the Securities Act or applicable state securities laws by reason of an exemption from the registration requirements of such laws, that the Company has no present intention of registering the Securities, and that the Securities may not be transferred unless such transfer is registered under the Securities Act or is exempt from registration; and (c) the Lender (i) is an "**accredited investor**" as that term is defined in Rule 501 of Regulation D under the Securities Act, (ii) has the ability to bear the economic risks of the Lender's investment in the Securities and (iii) has not been offered the Securities by any form of general solicitation.

19. <u>Confidentiality.</u> The Lender agrees to use the same degree of care as it uses to protect its own confidential information for any information obtained by the Lender pursuant to this letter. The Lender agrees that it will not, unless otherwise required by law or the rules of any national securities exchange, association or marketplace, disclose such information without the prior written consent of the Company except such information that: (a) was in the public domain prior to the time it was obtained by the Lender; (b) is or becomes (through no fault of the Lender) generally available to the public; (c) was in the Lender's possession or known by it without restriction prior to obtaining the information from the Company; (d) was rightfully disclosed to the Lender by a third party without restriction; or (e) was independently developed without any use of the Company's confidential information. Notwithstanding the foregoing, the Lender may disclose such proprietary or confidential information to its legal counsel or accountants for the purpose of reviewing and consummating the transactions contemplated by the parties.

20. <u>Disclosure of Transaction.</u> The Company may share the Loan or this letter with a prospective investor or lender as part of the Seed Round. For the avoidance of doubt, each party, and each of their officers, directors, affiliates or subsidiaries, may disclose the existence of the commercial relationship between the parties.

21. <u>Cooperation.</u> Each party shall take all actions as may be reasonably necessary to consummate the sale contemplated by Section 2, including, without limitation, entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

22. <u>Assignment.</u> The rights provided in this letter may not be assigned or transferred by the Lender without the Company's written consent. This letter is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this letter.

23. <u>Amendment and Modification; Waiver.</u> This letter may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

the party so waiving. Except as otherwise set forth in this letter, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this letter shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

24. <u>Notices.</u> All notices and other communications hereunder must be in writing and sent to a party at the physical address at the top of this letter, or to the email address in the signature block. Notices are deemed to have been given (a) when delivered by hand (with confirmation of receipt), (b) when received by addressee sent by nationally recognized overnight carrier, (c) on the day sent if sent by email (with confirmation of receipt), or (d) three days after mailing if sent by certified mail, return receipt requested.

25. <u>Governing Law.</u> This letter, and any disputes arising under this letter, will be governed by and construed in accordance with the laws of the State of Alabama, without giving effect to any conflict of laws principle to the contrary. The Company and the Lender agree that the state and federal courts located in Mobile County, Alabama will have exclusive jurisdiction over any dispute between them arising out of this letter.

26. <u>Entire Agreement.</u> This letter, the Note, and the MOU, and any duly executed agreements entered into by the parties (the "**Agreement**") constitutes the entire agreement between the parties concerning the subject matter hereof. No prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the parties will be of any force or effect. Each party represents and warrants that, in entering and performing its obligations under this Agreement, it does not and will not rely on any prior promise, inducement, or representation allegedly made by or on behalf of the other party with respect to the subject matter hereof, nor on any course of dealing or custom and usage in the trade, except as such promise, inducement, or representation may be expressly set forth herein

27. <u>Applicability.</u> If there is an express conflict between this letter, the Note, and the MOU, then the documents control in the following order: first, the letter, second the Note, third the MOU, and fourth any other duly executed agreements entered by the parties. To the extent possible, all documents are intended to be read harmoniously. Any other conflict with the terms of the Agreement are expressly rejected, null, and void.

28. <u>Counterparts.</u> This letter may be executed in counterparts, each of which will be deemed original, but all of which together will be deemed to be one and the same letter. Counterparts may be duly delivered and executed by email or electronic signature service.

*Signature page attached*

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

IN WITNESS WHEREOF, the parties hereto have executed this letter as of the date first above written.

Very truly yours,

ENTROPIQ CORPORATION

By _Steven Jasmin_

Name: Steven Jasmin

Title: President

Email: sjasmin@gisqsp.com

Agreed to and accepted:

_Warren H. Nicholson_

Name:  Warren H. Nicholson

Email: warren.nicholson@nfina.com

Agreed to and accepted:

GIS QSP Skunkworks Inc., formerly known as Precision113 Inc.

By _Steven Jasmin_

Name: Steven Jasmin

Title: CEO

Email: sjasmin@gisqsp.com

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

# EXHIBIT A

EXHIBIT A

| EntropiQ Cap Table | Investment | Common Stock | Common Stock % | SAFE converted to Common Stock | Option converted to Common Stock | SAFE Round % Ownership | Fully Diluted Capitalization | Fully Diluted % Ownership |
|---|---|---|---|---|---|---|---|---|
| GIS QSP SW | $ - | 10,000 | 100.00% | 0 | 0 | 0.00% | 10,000 | 39.76% |
| Loan Option Shares | $ 2,500,000.00 | | 0.00% | 0 | 7,576 | 50.00% | 7,576 | 30.12% |
| Lender Discount Shares | $ - | | 0.00% | 0 | 0 | 0.00% | 0 | 0.00% |
| Angel Investors | $ 2,500,000.00 | | 0.00% | 7,576 | 0 | 50.00% | 7,576 | 30.12% |
| Total | $ 5,000,000.00 | 10,000 | 100.00% | 7,576 | 7,576 | 100.00% | 25,152 | 100.00% |

**Total Shares**

| | |
|---|---|
| SAFE Note Shares issued | 15,152 |
| Option Shares Available for Purchase | 7,576 |

**SAFE Round**

| | |
|---|---|
| Pre Money Valuation | $ 3,300,000.00 |
| Post Money Valuation | $ 8,300,000.00 |
| SAFE Amount to Raise | $ 5,000,000.00 |
| Share Price | $ 330.00 |

**Lender Discount Purchase**

| | |
|---|---|
| Lender Discount | 39.39% |
| Discount Share Price | $ 200.00 |

**Option**

| | |
|---|---|
| Option Shares Available | 7,576 |
| Option Exercise Price | $ 330.00 |
| Total Purchase Amount | $ 2,500,000.00 |
| Total Option Shares Post-SAFE | 25,152 |
| % Ownership Post-SAFE | 30.12% |

**Loan Repayment Schedule**

| | |
|---|---|
| Loan Principal | $ 2,500,000.00 |
| Base Rate Interest | 11.175% |
| Federal Reserve Bank of New York 30 Day Average  (12.19.24) | 4.60460% |

| Month | Interest Payment (EST) | Principal Payment | Outstanding Loan Balance | Option Shares Available by Forgiveness of Loan | Option Shares Available for Purchase in Cash | Price of Remaining Option Shares | Check | Post-SAFE % Ownership |
|---|---|---|---|---|---|---|---|---|
| 1 | $ 25,242.00 | $ - | $ 2,500,000.00 | 7,576 | 0 | $ - | 7,576 | 30.12% |
| 2 | $ 25,242.00 | $ - | $ 2,500,000.00 | 7,576 | 0 | $ - | 7,576 | 30.12% |
| 3 | $ 25,242.00 | $ - | $ 2,500,000.00 | 7,576 | 0 | $ - | 7,576 | 30.12% |
| 4 | $ 25,242.00 | $ - | $ 2,500,000.00 | 7,576 | 0 | $ - | 7,576 | 30.12% |
| 5 | $ 25,242.00 | $ - | $ 2,500,000.00 | 7,576 | 0 | $ - | 7,576 | 30.12% |
| 6 | $ 25,242.00 | $ - | $ 2,500,000.00 | 7,576 | 0 | $ - | 7,576 | 30.12% |
| 7 | $ 32,091.45 | $ 59,523.81 | $ 2,440,476.19 | 7,395 | 180 | $ 59,523.81 | 7,575 | 30.12% |
| 8 | $ 31,308.73 | $ 59,523.81 | $ 2,380,952.38 | 7,215 | 361 | $ 119,047.62 | 7,576 | 30.12% |
| 9 | $ 30,526.01 | $ 59,523.81 | $ 2,321,428.57 | 7,035 | 541 | $ 178,571.43 | 7,576 | 30.12% |
| 10 | $ 29,743.29 | $ 59,523.81 | $ 2,261,904.76 | 6,854 | 722 | $ 238,095.24 | 7,576 | 30.12% |
| 11 | $ 28,960.58 | $ 59,523.81 | $ 2,202,380.95 | 6,674 | 902 | $ 297,619.05 | 7,576 | 30.12% |
| 12 | $ 28,177.86 | $ 59,523.81 | $ 2,142,857.14 | 6,494 | 1,092 | $ 357,142.86 | 7,576 | 30.12% |
| 13 | $ 27,395.14 | $ 59,523.81 | $ 2,083,333.33 | 6,313 | 1,263 | $ 416,666.67 | 7,576 | 30.12% |
| 14 | $ 26,612.42 | $ 59,523.81 | $ 2,023,809.52 | 6,133 | 1,443 | $ 476,190.48 | 7,576 | 30.12% |
| 15 | $ 25,829.70 | $ 59,523.81 | $ 1,964,285.71 | 5,952 | 1,623 | $ 535,714.29 | 7,575 | 30.12% |
| 16 | $ 25,046.98 | $ 59,523.81 | $ 1,904,761.91 | 5,772 | 1,804 | $ 595,238.10 | 7,576 | 30.12% |
| 17 | $ 24,264.27 | $ 59,523.81 | $ 1,845,238.10 | 5,592 | 1,984 | $ 654,761.90 | 7,576 | 30.12% |
| 18 | $ 23,481.55 | $ 59,523.81 | $ 1,785,714.29 | 5,411 | 2,165 | $ 714,285.71 | 7,576 | 30.12% |
| 19 | $ 22,698.83 | $ 59,523.81 | $ 1,726,190.48 | 5,231 | 2,345 | $ 773,809.52 | 7,576 | 30.12% |
| 20 | $ 21,916.11 | $ 59,523.81 | $ 1,666,666.67 | 5,051 | 2,525 | $ 833,333.33 | 7,576 | 30.12% |
| 21 | $ 21,133.39 | $ 59,523.81 | $ 1,607,142.86 | 4,870 | 2,706 | $ 892,857.14 | 7,576 | 30.12% |
| 22 | $ 20,350.67 | $ 59,523.81 | $ 1,547,619.05 | 4,690 | 2,886 | $ 952,380.95 | 7,576 | 30.12% |
| 23 | $ 19,567.96 | $ 59,523.81 | $ 1,488,095.24 | 4,509 | 3,066 | $ 1,011,904.76 | 7,575 | 30.12% |
| 24 | $ 18,785.24 | $ 59,523.81 | $ 1,428,571.43 | 4,329 | 3,247 | $ 1,071,428.57 | 7,576 | 30.12% |
| 25 | $ 18,002.52 | $ 59,523.81 | $ 1,369,047.62 | 4,149 | 3,427 | $ 1,130,952.38 | 7,576 | 30.12% |
| 26 | $ 17,219.80 | $ 59,523.81 | $ 1,309,523.81 | 3,968 | 3,608 | $ 1,190,476.19 | 7,576 | 30.12% |
| 27 | $ 16,437.08 | $ 59,523.81 | $ 1,250,000.00 | 3,788 | 3,788 | $ 1,250,000.00 | 7,576 | 30.12% |
| 28 | $ 15,654.37 | $ 59,523.81 | $ 1,190,476.19 | 3,608 | 3,968 | $ 1,309,523.81 | 7,576 | 30.12% |
| 29 | $ 14,871.65 | $ 59,523.81 | $ 1,130,952.38 | 3,427 | 4,149 | $ 1,369,047.62 | 7,576 | 30.12% |
| 30 | $ 14,088.93 | $ 59,523.81 | $ 1,071,428.57 | 3,247 | 4,329 | $ 1,428,571.43 | 7,576 | 30.12% |
| 31 | $ 13,306.21 | $ 59,523.81 | $ 1,011,904.76 | 3,066 | 4,509 | $ 1,488,095.24 | 7,575 | 30.12% |
| 32 | $ 12,523.49 | $ 59,523.81 | $ 952,380.95 | 2,886 | 4,690 | $ 1,547,619.05 | 7,576 | 30.12% |
| 33 | $ 11,740.77 | $ 59,523.81 | $ 892,857.14 | 2,706 | 4,870 | $ 1,607,142.86 | 7,576 | 30.12% |
| 34 | $ 10,958.06 | $ 59,523.81 | $ 833,333.33 | 2,525 | 5,051 | $ 1,666,666.67 | 7,576 | 30.12% |
| 35 | $ 10,175.34 | $ 59,523.81 | $ 773,809.52 | 2,345 | 5,231 | $ 1,726,190.48 | 7,576 | 30.12% |
| 36 | $ 9,392.62 | $ 59,523.81 | $ 714,285.72 | 2,165 | 5,411 | $ 1,785,714.29 | 7,576 | 30.12% |
| 37 | $ 8,609.90 | $ 59,523.81 | $ 654,761.91 | 1,984 | 5,592 | $ 1,845,238.09 | 7,576 | 30.12% |
| 38 | $ 7,827.18 | $ 59,523.81 | $ 595,238.10 | 1,804 | 5,772 | $ 1,904,761.90 | 7,575 | 30.12% |
| 39 | $ 7,044.46 | $ 59,523.81 | $ 535,714.29 | 1,623 | 5,952 | $ 1,964,285.71 | 7,576 | 30.12% |
| 40 | $ 6,261.75 | $ 59,523.81 | $ 476,190.48 | 1,443 | 6,133 | $ 2,023,809.52 | 7,576 | 30.12% |
| 41 | $ 5,479.03 | $ 59,523.81 | $ 416,666.67 | 1,263 | 6,313 | $ 2,083,333.33 | 7,576 | 30.12% |
| 42 | $ 4,696.31 | $ 59,523.81 | $ 357,142.86 | 1,082 | 6,494 | $ 2,142,857.14 | 7,576 | 30.12% |
| 43 | $ 3,913.59 | $ 59,523.81 | $ 297,619.05 | 902 | 6,674 | $ 2,202,380.95 | 7,576 | 30.12% |
| 44 | $ 3,130.87 | $ 59,523.81 | $ 238,095.24 | 722 | 6,854 | $ 2,261,904.76 | 7,576 | 30.12% |
| 45 | $ 2,348.15 | $ 59,523.81 | $ 178,571.43 | 541 | 7,035 | $ 2,321,428.57 | 7,576 | 30.12% |
| 46 | $ 1,565.44 | $ 59,523.81 | $ 119,047.62 | 361 | 7,215 | $ 2,380,952.38 | 7,576 | 30.12% |
| 47 | $ 782.72 | $ 59,523.81 | $ 59,523.81 | 180 | 7,395 | $ 2,440,476.19 | 7,575 | 30.12% |
| 48 | $ 0.00 | $ 59,523.81 | $ 0.00 | 0 | 7,576 | $ 2,500,000.00 | 7,576 | 30.12% |

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

**EXHIBIT B**

**EXERCISE NOTICE**

**EntropiQ Corporation**

Attention: Corporate Secretary

The undersigned hereby elects to purchase, pursuant to the provisions of the Option for Conversion to Equity Agreement dated December 20, 2024 (the "**letter**"), the number of Option Shares calculated by the Company, pursuant to the terms of the letter. The undersigned hereby irrevocably agrees to tender payment in cash of the Purchase Price (if any) in full at the Closing. Any term not defined in this Exercise Notice is defined in the letter.

☐    By checking this box, I am forgiving the Loan.

☐    By checking this box, I am electing to purchase additional Option Shares by payment of the Purchase Price pursuant to the terms of the letter. I agree to pay the price as calculated by the Company and confirmed by myself. I may assent to the Company's calculation of the Purchase Price due, and number of shares purchased therefore, by payment of the Purchase Price at Closing, or in writing.

☐    By checking this box, the Company has failed to meet the Prerequisite, and I am electing to purchase common stock of the company by payment of the applicable discount price pursuant to the terms of the letter. I agree to pay the price as calculated by the Company and confirmed by myself. I may assent to the Company's calculation of the payment due, and number of shares purchased therefore, by payment at Closing, or in writing.

If the parties disagree as to the Company's calculations below, then the parties agree to submit the dispute to the Board of Directors of the Company for resolution. All other terms and conditions of the Exercise Notice are governed by the letter.

**Holder**

**Warren H. Nicholson**

By:_____

Name:_____

Address:_____

Date of Exercise Notice:_____

Docusign Envelope ID: 8A703059-1635-4D9A-8435-C3FAEFB7A375

*Completed by Company and returned to Holder according to Section 24 of the letter for approval*

As of the Date of Exercise Notice, the outstanding principal balance of the Loan is: _____

If electing to purchase additional Option Shares, then the Purchase Price is: _____
(Difference between $2,500,000 and the current outstanding principal balance of the Loan)

Issued and outstanding common stock of the Company as of the Date of Exercise Notice: _____

Option Exercise Price: _____

Option Shares: _____

*If exercised pursuant to Section 8:*

Amount raised from Angel Investors: _____

Discount Share Price: _____

Common Stock: _____

Agreed to and accepted:

_____

Name:  Warren H. Nicholson